**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TWIN MASTER FUND, LTD., TWIN OPPORTUNITIES FUND, LP, AND TWIN SECURITIES, INC., | |
| Plaintiffs, | **Civ. A. No. 1:19-cv-03648** |
| v. | **Hon. Matthew F. Kennelly** |
| AKORN, INC., RAJAT RAI, DUANE A. PORTWOOD, ALAN WEINSTEIN, RONALD M. JOHNSON, AND BRIAN TAMBI, | |
| Defendants. | |
| MANIKAY MASTER FUND, LP AND MANIKAY MERGER FUND, LP, | |
| Plaintiffs, | **Civ. A. No. 1:19-cv-04651** |
| v. | **Hon. Matthew F. Kennelly** |
| AKORN, INC., RAJAT RAI, DUANE A. PORTWOOD, ALAN WEINSTEIN, RONALD M. JOHNSON, AND BRIAN TAMBI, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT
MOTIONS TO DISMISS THE *TWIN MASTER FUND* AND *MANIKAY MASTER
FUND* COMPLAINTS PURSUANT TO FED. R. CIV. P. 12(b)(6) & 9(b)
<u>AND 15 U.S.C. § 78u-4</u>**

**CRAVATH, SWAINE & MOORE LLP**
Robert H. Baron (admitted *pro hac vice*)
    825 Eighth Avenue
       New York, NY 10019
           rbaron@cravath.com

and

**FIGLIULO & SILVERMAN, P.C.**
James R. Figliulo
    10 S. LaSalle Street, Suite 3600
       Chicago, IL 60602
          jfigliulo@fslegal.com

*Attorneys for Defendants*

Dated:  September 13, 2019

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

TABLE OF ABBREVIATIONS ........................................................................... viii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF ALLEGED FACTS ..................................................................... 2

    I.      The Regulatory Framework in the Pharmaceutical Industry ................... 3

    II.     Akorn's Merger with Fresenius ................................................................. 4

         A.     FDA's 2016 Inspection of Akorn's Decatur Facility ................... 4

         B.     Fresenius Agrees to Acquire Akorn:  AKRX surges 32% to $33 ............... 5

         C.     Akorn's Performance "F[a]ll[s] Off a Cliff":  AKRX stays above $30. ..... 6

         D.     Fresenius Announces the Deal Is In Trouble:  AKRX falls to $18. ........... 6

         E.     Fresenius Terminates the Merger:  AKRX falls to $13. ............................. 7

         F.     FDA Inspects Two Akorn Facilities ........................................... 8

         G.     The Chancery Court Finds the First Ever MAE:  AKRX falls to $5. .......... 8

    III.    The Current Litigation ................................................................................ 8

ARGUMENT ........................................................................................................... 9

    I.      Plaintiffs' Federal and Common Law Fraud Claims Fail Because Plaintiffs Do Not Plead Actionable Misstatements or Omissions. ........................ 10

         A.     Statements Concerning Compliance with FDA Regulations ................... 15

               1.    The risk disclosures were accurate and implied nothing about whether the risks had materialized. ................................. 16

               2.    Item 303 neither provides a private cause of action nor requires companies to engage in self-flagellation. ....................... 17

               3.    The regulatory representation was an allocation of risk between private parties, not a statement of fact, and was true when made .. 19

               4.    The policy statements on Akorn's website were inactionable puffery. ................................................................ 20

B.     Statements Concerning Manufacturing Facilities ......................................20

    1.    Defendants accurately disclosed the results of FDA facility inspections without touting Akorn's quality prowess....................20

    2.    Statements concerning Akorn's competitive strengths were the type of generalized, positive remarks that courts routinely classify as puffery. ......................................................................21

    3.    Statements concerning an FDA re-inspection of Decatur were true and made before the facts Plaintiffs allege caused them to be misleading. ..........................................................................22

C.     Statements About Akorn's ANDA Pipeline ...............................................23

D.     Akorn's Contractual Commitment to Operate in the Ordinary Course .....25

E.     Statements Concerning the Data Integrity Investigations .........................26

F.     Statements Concerning Akorn's Disclosure Controls ...............................28

II.    Plaintiffs' Exchange Act and Common Law Fraud Claims Fail Because Plaintiffs Do Not Plead Loss Causation.................................................................29

III.    Plaintiffs' Section 18(a) Claims Are Untimely and Fail Adequately to Allege Actual Reliance. ......................................................................................................33

A.     Plaintiffs' Section 18(a) Claims Are Untimely........................................33

B.     Plaintiffs Fail Adequately To Plead Actual Reliance. ..............................34

IV.    Plaintiffs Do Not State a Section 20(a) Claim. ......................................................35

CONCLUSION.....................................................................................................................35

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*421-A Tenants Assoc. Inc. v. 125 Court Street LLC*, 2017 WL 6612933 (E.D.N.Y. Nov. 2, 2017) ........................................................................................................34

*Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995) .............................................18

*Akorn, Inc. v. Fresenius Kabi AG*, 198 A.3d 724 (Del. 2018) ......................................32

*Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018) ................... *passim*

*Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001) .......................................... *passim*

*Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989) ......................................18

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ..................................................................12

*Beezley v. Fenix Parts, Inc.*, 2018 WL 3156805 (N.D. Ill. June 26, 2018) ...................................33

*Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502 (7th Cir. 2007) .......................................10

*Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ................14, 17

*Carvelli v. Ocwen Fin. Corp.*, 2019 WL 3819305 (11th Cir. Aug. 15, 2019) ..............................21

*City Capital Assoc. v. Interco, Inc.*, 696 F. Supp. 1551 (D. Del. 1988) .......................................15

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932 (S.D. Ind. 2005) ........................................................................................................32

*City of Pontiac Gen. Emp. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811 (W.D. Mich. 2012) ................................................................................................. *passim*

*Conlee v. WMS Indus., Inc.*, 2013 WL 1767648 (N.D. Ill. Apr. 24, 2013) ...................... 10-11, 19

*Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996) .........................................................9, 10

*Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589 (7th Cir. 2019) ..................................10

*DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708 (N.D. Ill. 2005) ...............................................35

*Di Rito v. Metropolitan Life Ins. Co.*, 2018 WL 6769317 (Ill. App. Ct. Dec. 24, 2018) ........................................................................................................12

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) .....................................................11, 23, 28

*Donovan v. ABC-NACO Inc.*, 2002 WL 1553259 (N.D. Ill. July 15, 2002)..................................15

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .....................................................................29

*Gaines v. Guidant Corp.*, 2004 WL 2538374 (S.D. Ind. Nov. 8, 2004).......................................12

*Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)....................................................... *passim*

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228
(S.D.N.Y. 1999) ...........................................................................................................................35

*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018) .............................21

*IDT Corp. v. eGlobe, Inc.*, 140 F. Supp. 2d 30 (D.D.C. 2001)......................................................25

*In re Bear Stearns Cos. Sec., Deriv. & ERISA Litig.*, 995 F. Supp. 2d 291
(S.D.N.Y. 2014)....................................................................................................................34, 35

*In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) .........................................29

*In re Brightpoint, Inc.*, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ..............................................2

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .......................................18

*In re Copper Antitrust Litig.*, 436 F.3d 782 (7th Cir. 2006) ..........................................................34

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352 (E.D.N.Y. 2013)............................................28, 29

*In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31 (1st Cir. 2014) .......................................................13

*In re Immucor, Inc. Sec. Litig.*, 2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) ............................30

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014) ....................34

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004) .............................10

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) ...................................................17

*In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583
(S.D. Tex. 2018)............................................................................................................................19

*In re Teledyne Def. Contracting Deriv. Litig.*, 849 F. Supp. 1369 (C.D. Cal. 1993) ...................18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*,
2017 WL 2798525 (N.D. Cal. June 28, 2017).........................................................................18

*Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454 (1975) .......................................................34

*Koplin v. Labe Fed. Sav. & Loan Assoc.*, 748 F. Supp. 1336 (N.D. Ill. 1990).............................33

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)..........................................29

*Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49 (D. Mass. 1995) ......................9

*Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452 (N.D. Tex. 2018)..........................................21

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008).................................18

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ..........................................................33

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993).........................................25

*Montanez v. Wolfenberger*, 2013 WL 12120058 (N.D. Ill. Oct. 1, 2013) .....................................34

*Oakland Cty. Emps.' Ret. Sys. v. Massaro*, 736 F. Supp. 2d 1181 (N.D. Ill. 2010) .....................10

*Ojo v. Luong*, 2016 WL 1337274 (D.N.J. Apr. 5, 2016) ................................................27

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551
    (S.D.N.Y. 2018) ..............................................................................13, 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015).............................................................. *passim*

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ...............................................17

*Pelosi v. Spota*, 607 F. Supp. 2d 366 (E.D.N.Y. 2009) ........................................27

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933
    (7th Cir. 2018)..............................................................................9

*Petrakopoulou v. DHR Int'l, Inc.*, 590 F. Supp. 2d 1013 (N.D. Ill. 2008) ...................13

*Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017 (7th Cir. 2013) ............................................2

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
    *Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858 (N.D. Ill. 2011) .....................15

*Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84 (Ill. App. Ct. 2002) ..............................14

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008)............................................2, 18, 35

*Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991 (7th Cir. 2007)....................................30, 33

*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011)..........................................25

*Rex & Roberta Ling Living Tr. v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389
    (S.D.N.Y. 2018)..............................................................................28, 29

*Robinson v. Purcell Const. Corp.*, 2015 WL 5603022 (N.D.N.Y. Sept. 22, 2015)......................27

*Rosenbaum v. White*, 692 F.3d 593 (7th Cir. 2012).........................................................12

*Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923 (N.D. Ill. 2011)...............................20

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019)..........................................................20

*Société Générale Sec. Serv., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018)..........................................................................................27, 28

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004)............................21

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401 (S.D.N.Y. 2014) .....................................................................10, 35

*Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833 (N.D. Ill. 2003)................................14, 24

*Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ........................29, 32

*Teamsters Affiliates Pension Plan v. Walgreen Co.*, 2010 WL 3894149 (N.D. Ill. Sept. 29, 2010) ...............................................................................15, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............................10

*Tiberius Capital, LLC v. PetroSearch Energy Corp.*, 2011 WL 1334839 (S.D.N.Y. Mar. 31, 2011) .........................................................................................9

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)......................................................14, 22

*Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893 (Ill. 2007) ...................................9

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007).................................................................................................29

*Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)....................24

*Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) ...............................................................................17

*Witriol v. Conexant Sys., Inc.*, 2006 WL 3511155 (D.N.J. Dec. 4, 2006) ....................35

**Statutes & Rules**

15 U.S.C. § 78r ...........................................................................................................9, 33

15 U.S.C. § 78u-4 ...........................................................................................................10

15 U.S.C. § 78u-5 ....................................................................................................14, 24

Fed. R. Civ. P. 9(b) ...............................................................................................................10

**Other Authorities**

17 C.F.R. § 229.303 ..............................................................................................................17

17 C.F.R. § 240.10b-5.....................................................................................................19, 25

FDA, *FDA Access to Results of Quality Assurance Program Audits and
    Inspections*, Compliance Policy Guide § 130.300 (June 2, 2007) .......................................4, 18

## TABLE OF ABBREVIATIONS

| 201_ 10-K | Akorn's Annual Report on SEC Form 10-K for the fiscal year in question |
|---|---|
| 201_ Q_ Earnings Tr. | Transcript of Akorn's Earnings Call for the quarter and year in question |
| ____, 201_ 8-K | Akorn's Current Report on SEC Form 8-K filed on the date in question |
| Akorn or Company | Akorn, Inc. |
| ANDA | Abbreviated new drug application |
| Complaints | *Twin* Complaint and *Manikay* Complaint |
| Defendants | Akorn, Rajat Rai, Duane A. Portwood, Alan Weinstein, Ronald Johnson and Brian Tambi |
| Ex. _ | Exhibit filed herewith |
| Exchange Act | The Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, as amended |
| FDA | U.S. Food and Drug Administration |
| *Manikay* ¶ _ | Paragraph of the *Manikay* Complaint |
| *Manikay* Ex. _ | Exhibit filed by Manikay in connection with the *Manikay* Complaint. *See Manikay Master Fund, LP v. Akorn, Inc.*, 19-cv-04651, ECF No. 1.1 (N.D. Ill. July 10, 2019). |
| *Manikay* Complaint | Complaint (Corrected), *Manikay Master Fund, LP v. Akorn, Inc.*, 19-cv-04651, ECF No. 5 (N.D. Ill. July 11, 2019) |
| Manikay | Manikay Master Fund, LP and Manikay Merger Fund, LP |
| MAE | Material adverse effect |
| Merger Agreement | The agreement and plan of merger between Akorn, Fresenius Kabi AG, Quercus Acquisition, Inc. and Fresenius Se & Co. KGaA, dated April 24, 2017 |
| Merger | The acquisition of Akorn by Fresenius Kabi AG for $34/share, as contemplated by the Merger Agreement |
| Ordinary Course Covenant | A covenant by Akorn to Fresenius (found in Section 5.01 of the Merger Agreement) |
| Plaintiffs | Twin and Manikay |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 |
| SEC | U.S. Securities and Exchange Commission |

| Section 10(b) | 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 |
|---|---|
| Section 18(a) | Exchange Act, 15 U.S.C. § 78r |
| Section 20(a) | Exchange Act, 15 U.S.C. § 78t(a) |
| *Twin* ¶ _ | Paragraph of the *Twin* Complaint |
| *Twin* Ex. _ | Exhibit filed by Twin in connection with the *Twin* Complaint. *See Twin Master Fund, Ltd. v. Akorn, Inc.*, 19-cv-03648, ECF No. 1-1 (N.D. Ill. May 31, 2019) |
| *Twin* Complaint | Complaint, *Twin Master Fund, Ltd. v. Akorn, Inc.*, 19-cv-03648, ECF No. 1 (N.D. Ill. May 31, 2019) |
| Twin | Twin Master Fund, Ltd., Twin Opportunities Fund, LP and Twin Securities, Inc. |

## PRELIMINARY STATEMENT

Plaintiffs are merger arbitrageurs that made speculative bets on a proposed merger between Akorn, Inc. ("Akorn" or the "Company") and Fresenius Kabi AG ("Fresenius") in 2017 and 2018. They lost those bets when Fresenius successfully terminated the merger on the basis of the first material adverse effect (or "MAE") ever found by the Delaware courts. Now, in an effort to force Akorn to indemnify them for their betting losses, Plaintiffs seek to hold hostage a carefully negotiated class-wide settlement agreement.

That effort fails, as Plaintiffs have not stated a claim on which relief can be granted. *First*, Plaintiffs' Section 10(b), Section 18(a) and common law fraud claims fail because they have not identified any actionable misstatements or omissions. Companies are under no freestanding duty to disclose regulatory status, and none of the affirmative statements identified by Plaintiffs was false when made. (*See* Argument Section I.) *Second*, Plaintiffs' Section 10(b), Section 18(a) and common law fraud claims fail because they do not plead loss causation. Plaintiffs' merger arbitrage losses were caused when the consummation of a valuable merger with Fresenius—a merger that had supported Akorn's share price throughout the time period Plaintiffs made their purchases—became increasingly unlikely, culminating in the merger's successful termination. That termination was upheld by the Delaware courts on two independent grounds: (i) a breach of Akorn's regulatory compliance representations and warranties that rose to the level of an MAE (the "Regulatory MAE") and (ii) an unrelated financial decline that was so severe as to constitute an MAE (the "Financial MAE"). Because the courts found Akorn had experienced an independent Financial MAE, Fresenius's termination would have been proper— and Plaintiffs' losses would have been sustained—*regardless* of Akorn's regulatory status, negating any inference of loss causation. (*See* Argument Section II.) *Third*, all of Manikay's and all but one of Twin's Section 18(a) claims are time barred. Moreover, Plaintiffs have failed

adequately to plead actual reliance, as required. (*See* Argument Section III.) *Fourth*, because Plaintiffs have failed adequately to plead a primary violation, they cannot maintain a Section 20(a) claim. (*See* Argument Section IV.) The Complaints must be dismissed.

## STATEMENT OF ALLEGED FACTS

Defendant Akorn is a specialty generic pharmaceuticals company organized under the laws of Louisiana and headquartered in Lake Forest, Illinois. (*Twin* ¶ 25; *Manikay* ¶ 24.) Akorn's stock is publicly traded on NASDAQ under the trading symbol "AKRX". (*Twin* ¶ 25; *Manikay* ¶ 24.) Defendants Rai, Portwood, Weinstein, Johnson and Tambi are all current or former officers or directors of Akorn. (*Twin* ¶¶ 26-30; *Manikay* ¶¶ 25-29.) Akorn's total market capitalization as of September 13, 2019 was approximately $460 million.

Plaintiffs Twin and Manikay are large hedge funds—claiming in SEC filings to have $284 million and $2.4 billion assets under management, respectively[1]—which allegedly began purchasing Akorn securities after the merger with Fresenius became public. (*Twin* ¶¶ 21-24, Exs. A-C; *Manikay* ¶¶ 21-23, Exs. A-B.) The funds' SEC filings state that they pursue (among other things) "merger arbitrage" investments,[2] which involve betting on the successful

---

[1] Ex. 1, Twin Securities, Inc., Brochure at 5 (Form ADV Part 2A) (Mar. 29, 2019), https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=566966 (hereinafter the "Twin Brochure"); Ex. 2, Manikay Partners, LLC, Brochure at 4 (Form ADV Part 2A ) (June 11, 2019), https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=584733 (hereinafter the "Manikay Brochure").

The Court may consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice". *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) (courts may take judicial notice of "documents in the public record, including ... stock prices"); *In re Brightpoint, Inc.*, 2001 WL 395752, at *15 n.6 (S.D. Ind. Mar. 29, 2001) (acknowledging that a court may take judicial notice of "documents filed with the SEC"). Among other documents, Plaintiffs have incorporated into the Complaints by reference the Chancery Court's opinion (*Twin* ¶¶ 119, 121, 142, 193; *Manikay* ¶¶ 118, 120, 141, 191), the Merger Agreement (*Twin* ¶¶ 106-07; *Manikay* ¶¶ 105-106) and the documents containing the allegedly false statements.

[2] *See* Ex. 1, Twin Brochure at 10; Ex. 2, Manikay Brochure at 4.

completion of impending mergers, in an effort to obtain the difference (or "arbitrage spread") between a target company's post-announcement market price and the price offered pursuant to the merger. The more likely a deal is to close, the smaller the arbitrage spread; the riskier a deal is, the larger the arbitrage spread becomes.[3]

I.     THE REGULATORY FRAMEWORK IN THE PHARMACEUTICAL INDUSTRY

Current Good Manufacturing Practices ("cGMP") are FDA regulations that address pharmaceutical manufacturing and product development, including the integrity of manufacturing and testing data. (*Twin* ¶¶ 41-48; *Manikay* ¶¶ 40-47.) FDA monitors cGMP compliance through routine inspections of manufacturing and development facilities. (*Twin* ¶ 49; *Manikay* ¶ 48.) If FDA observes objectionable practices, it may issue a "Form 483" at the inspection's conclusion. (*Twin* ¶ 50; *Manikay* ¶ 49.) A Form 483 "does not constitute a final Agency determination".[4] Once the facility responds to the Form 483 observations, FDA makes a formal determination (*Twin* ¶¶ 51-53; *Manikay* ¶¶ 50-52) to classify the facility as "voluntary action indicated" (or "VAI"), indicating the facility's proposed corrective action plan is adequate to address FDA's observations; "official action indicated" (or "OAI"), indicating the corrective action plan is inadequate; or "no action indicated" (or "NAI"), indicating no action is necessary.[5]

---

[3] *Cf.* Ex. 1, Twin Brochure at 12 ("Merger arbitrage transactions are inherently volatile.... If the proposed transaction is not consummated or delayed, the value of such securities purchased may decline significantly."); Ex. 2, Manikay Brochure at 11 ("If the requisite elements of an arbitrage strategy are not properly analyzed, or unexpected events or price movements intervene, losses can occur which can be magnified to the extent a Fund is employing leverage.").

[4] *City of Pontiac Gen. Emp. Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 816 (W.D. Mich. 2012) (quoting FDA Form 483 Frequently Asked Questions); FDA, *Form 483 Frequently Asked Questions* (July 2, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

[5] FDA, *Inspections Database Frequently Asked Questions* (July 2, 2018), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/inspections-database-frequently-asked-questions.

OAI status often results in a formal FDA "warning letter".[6]  (*Twin* ¶¶ 52-53; *Manikay* ¶¶ 51-52.)

Companies aim to monitor and improve cGMP compliance through internal audits and by hiring external consultants to assess their facilities.  (*Twin* ¶¶ 86-88; *Manikay* ¶¶ 85-87.)  In this fashion, companies identify and remediate possible cGMP issues before they become the basis for adverse FDA findings.  As a matter of policy, FDA does not review self-audit results.[7]

## II.   AKORN'S MERGER WITH FRESENIUS

### A.   FDA's 2016 Inspection of Akorn's Decatur Facility

In mid-2016, Akorn received a Form 483 following an FDA inspection at Akorn's manufacturing facility in Decatur, Illinois.  (*Twin* ¶ 62; *Manikay* ¶ 61.)  After implementing corrective actions, Defendant Rai, Akorn's former CEO, informed shareholders in November 2016 that "there is no remediation per se that we have to do at our Decatur site".  (*Twin* ¶ 159; *Manikay* ¶ 158.)  A few weeks later, on December 12, Akorn issued a press release announcing FDA had reinspected the Decatur facility without any observations.  (*Id*.)  Decatur's NAI classification by FDA was noted in Akorn's March 1, 2017 earnings release and earnings call.  (*Id*.)  However, the Company's annual report on Form 10-K, issued the same day, cautioned:

> "We are subject to extensive government regulations which if they change and or we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities."  (*Twin* ¶ 144; *Manikay* ¶ 143.)

This cautionary language was repeated in subsequent annual and quarterly reports.  (*Id.*)

---

[6] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, *7 (Del. Ch. Oct. 1, 2018) ("*Fresenius*").

[7] FDA, *FDA Access to Results of Quality Assurance Program Audits and Inspections*, Compliance Policy Guide § 130.300 (June 2, 2007), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-130300-fda-access-results-quality-assurance-program-audits-and-inspections (hereinafter "FDA Comp. Policy Guide") ("During routine inspections ... FDA will not review or copy reports and records that result from audits and inspections of the written quality assurance program ....").

**B.    Fresenius Agrees to Acquire Akorn:  AKRX surges 32% to $33.**

In late 2016, Akorn began negotiating with Fresenius, a German healthcare company, about a potential Merger.  (*Twin* ¶ 102; *Manikay* ¶ 101.)  On April 7, 2017, news of the potential Merger leaked to the market,[8] causing Akorn's share price to climb from $25 to over $32.[9]  Twin first bought Akorn securities four days later.  (*Twin* Exs. A-C.)  The companies signed the Merger Agreement on April 24, 2017, with a deal price of $34 per share—a 35% premium over Akorn's pre-leak market price.  (*Twin* ¶¶ 104-05, 108; *Manikay* ¶¶ 103-04, 107.)  The next day, Akorn traded above $33 per share.

The Merger Agreement contained various representations and warranties, each of which, to the extent relevant here, was qualified by language providing that it could be breached only if falsity of the representation would, "individually or in the aggregate, reasonably be expected to have a Material Adverse Effect".[10]  Upon signing, Akorn filed the Merger Agreement as an exhibit to SEC Form 8-K, which explained, among other things:

> "*The representations and warranties of [Akorn] contained in the Merger Agreement have been made solely for the benefit of [Fresenius]*.  In addition, such representations and warranties (a) have been made only for purposes of the Merger Agreement, ... are subject to materiality qualifications contained in the Merger Agreement which may differ from what may be viewed as material by investors, (e) were made only as of the date of the Merger Agreement or such other date as is specified in the Merger Agreement and (f) *have been included in the Merger Agreement for the purpose of allocating risk between [Akorn], on the one hand, and [Fresenius], on the other hand, rather than establishing matters as facts*.  Accordingly, the Merger Agreement is included with this filing only to provide investors with information regarding the terms of the Merger Agreement, and *not to provide investors with any other factual information regarding the Company or its subsidiaries or business.  Investors should not rely on the*

---

[8] Manuel Baigorri *et al.*, *Fresenius Says It's in Talks to Buy Generic Drugmaker Akorn*, BLOOMBERG (Apr. 7, 2017, 1:04 PM), https://www.bloomberg.com/news/articles/2017-04-07/fresenius-said-to-consider-bid-for-u-s-generic-drugmaker-akorn.

[9] Ex. 3, AKRX Share Price.  All subsequent references to Akorn's share price rely on this exhibit.

[10] Ex. 4, April 24, 2017 8-K, ex. 2.1 Merger Agreement § 3.18 (hereinafter "Merger Agreement").

> *representations and warranties or any descriptions thereof as characterizations of the actual state of facts or condition of [Akorn] or any of its subsidiaries or business.* Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures."[11]

According to Plaintiffs, investment analysts at their respective funds "actually and justifiably read [and] reviewed" this Form 8-K. (*Twin* ¶ 201; *Manikay* ¶ 199.)

### C.     Akorn's Performance "F[a]ll[s] Off a Cliff": AKRX stays above $30.

Shortly after signing the Merger Agreement, Akorn's financial performance "fell off a cliff".[12] The Delaware Chancery Court later found that Akorn suffered material year-over-year declines in revenue, operating income and earnings per share:

| | Year-Over-Year Change[13] | | | |
|---|---|---|---|---|
| | Q2 2017 | Q3 2017 | Q4 2017 | Q1 2018 |
| **Revenue** | (29%) | (29%) | (34%) | (27%) |
| **Operating Income** | (84%) | (89%) | (292%) | (134%) |
| **EPS** | (96%) | (105%) | (300%) | (170%) |

Despite these results, Akorn's stock remained above $30/share—well above its trading price the day before news of the Merger leaked—because investors had no reason to doubt that the Merger would close at the promised $34 per share. Manikay first bought Akorn securities in August 2017 (*Manikay* Exs. A-B), shortly after Akorn's disappointing Q2 2017 results were announced.[14]

### D.     Fresenius Announces the Deal Is In Trouble: AKRX falls to $18.

Akorn's financial performance outraged Fresenius, which began searching for an exit

---

[11] Ex. 4, April 24, 2017 8-K at 3 (emphases added).

[12] *Fresenius*, 2018 WL 4719347, at *1.

[13] *Id.* at *54.

[14] *Id.* at *21.

from the Merger Agreement.[15]  In November 2017, Fresenius informed Akorn that it intended to launch an investigation into Akorn's data integrity practices based on two fortuitously-timed anonymous letters received by senior Fresenius executives.  (*Twin* ¶ 111; *Manikay* ¶ 110.) Akorn later commenced its own investigation.  (*Twin* ¶¶ 119-20; *Manikay* ¶¶ 118-19.)

On February 26, 2019, Fresenius announced to the market that it was investigating Akorn's data integrity compliance and that "[t]he consummation of the transaction may be affected if the closing conditions under the merger agreement are not met".  (*Twin* ¶¶ 130, 208; *Manikay* ¶¶ 129, 206.)  Akorn released a statement disclosing its own investigation, and explaining that its "investigation has not found any facts that *would* result in a material impact on Akorn's operations and the Company does not *believe* this investigation should affect the closing of the transaction with Fresenius".  (*Twin* ¶ 131 (emphases added); *Manikay* ¶ 130.)  On these announcements—the first public sign of trouble with the Merger—Akorn's share price tumbled 38% from $30.28 to $18.65.  (*Twin* ¶ 209; *Manikay* ¶ 207.)  Plaintiffs Twin and Manikay, however, purchased more Akorn securities.  (*Twin* Exs. A-C; *Manikay* Exs. A-B.)

### E.    Fresenius Terminates the Merger:  AKRX falls to $13.

On April 22, 2018, Fresenius purported to terminate the Merger Agreement, citing the failure of "several closing conditions".  (*Twin* ¶¶ 132-33; *Manikay* ¶¶ 131-32.)  Akorn's share price fell from $19.70 to $13.05.  (*Twin* ¶ 212; *Manikay* ¶ 210.)  The next day, Akorn sued to compel Fresenius to close the Merger.  (*Twin* ¶ 135; *Manikay* ¶ 134.)  Looking to capitalize on a much larger arbitrage spread, Twin purchased more Akorn securities.  (*Twin* Exs. A-C.)

The Delaware Chancery Court held a five-day trial in July of 2018.  As the market

---

[15] *Id.* at *21-23 ("[The Fresenius Group CEO] candidly admitted that at this point [September 2017], he personally wanted to terminate the transaction.").

followed the litigation, Akorn's share price fluctuated between roughly $11.50 and $19.50. Twin continued to buy Akorn securities throughout. (*Twin* Exs. A-C.)

### F.     FDA Inspects Two Akorn Facilities

In April/May 2018 and July/August 2018, FDA conducted inspections of Akorn's facilities in Decatur, Illinois and Somerset, New Jersey.[16]  Both inspections resulted in Forms 483.[17]  Ultimately, on January 4, 2019, and June 13, 2019, FDA would issue two warning letters stemming from the observations in these Forms 483.[18]  (*Twin* ¶ 143; *Manikay* ¶ 142.)

### G.     The Chancery Court Finds the First Ever MAE:  AKRX falls to $5.

On October 1, 2018, the Chancery Court ruled that Fresenius validly terminated the Merger on three independent grounds.  *First*, the Chancery Court held that Fresenius could refuse to close because Akorn's declining financial performance constituted a Financial MAE— the first in Delaware history.[19]  *Second*, it concluded that Akorn's representation as to regulatory compliance was false at termination, giving rise to a Regulatory MAE—another first in Delaware history.  *Third*, it concluded that Akorn breached its Ordinary Course Covenant based on Akorn's efforts to comply with FDA regulations after signing.  On the news of the Chancery Court's decision, Akorn's stock fell from nearly $13 to $5.36.  (*Twin* ¶ 217.)

## III.    THE CURRENT LITIGATION

On March 8, 2018, a purported Akorn shareholder filed a putative class action complaint seeking to represent a class of Akorn's shareholders that were damaged by alleged misstatements

---

[16] *Fresenius*, 2018 WL 4719347, at *40-43.

[17] *Id*.

[18] Ex. 5, June 25, 2019 8-K, ex. 99.1.

[19] *Fresenius*, 2018 WL 4719347, at *55, 62.

concerning Akorn's cGMP compliance.[20]  That complaint was amended in September 2018 by Court-appointed lead plaintiffs.  On March 8, 2019, the parties disclosed in a letter to the Court that they had scheduled a mediation for May 3, 2019.[21]  Shortly thereafter, on May 31, Twin filed suit.  Manikay sued on July 10, 2019.  On July 25, Defendants and lead plaintiffs reached an agreement in principle to settle the class action.  Five days later, both Plaintiffs informed the Court that they intended to opt out of the settlement without even knowing its terms.

## ARGUMENT

Plaintiffs assert claims under Sections 10(b) and 18(a) and for common law fraud, each of which requires that Plaintiffs allege:  (1) a false or misleading statement or omission of material fact on which a reasonable investor would rely, and (2) loss causation.  *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (Section 10(b)); 15 U.S.C. § 78r (Section 18(a)); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996) (common law fraud under Illinois law).[22]  Moreover, to prevail on their claims, Plaintiffs must also demonstrate that Defendants acted with scienter—an intent to deceive, manipulate or defraud, or with recklessness.  *See Kohl's*, 895 F.3d at 936 (Section 10(b) requires scienter); 15 U.S.C. § 78r (providing that lack of scienter is an affirmative defense to a Section 18(a) claim); *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 59 (D. Mass. 1995)

---

[20] *In re Akorn, Inc. Data Integrity Sec. Litig.*, No. 18-cv-01713, ECF No. 1 (N.D. Ill. Mar. 8, 2018).

[21] *Id.*, ECF No. 88.

[22] Plaintiffs do not identify the jurisdiction under whose laws they bring their common law fraud claims.  The laws of New York or Illinois most likely govern these claims.  (*See Twin* ¶¶ 21-23, 25; *Manikay* ¶¶ 21-22, 24.)  Because "[a]n actual conflict does not exist between the laws of New York and Illinois regarding the elements for common law fraud", *Tiberius Capital, LLC v. PetroSearch Energy Corp.*, 2011 WL 1334839, at *8 (S.D.N.Y. Mar. 31, 2011), Defendants assume for purposes of this motion only that Illinois law applies to Plaintiffs' state law claim.  *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007).

(dismissing a Section 18(a) claim for failure to allege any "impropriety" (internal quotation marks omitted)); *Connick*, 675 N.E.2d at 591 (Illinois common law fraud requires scienter).

Because Plaintiffs' claims set forth "averments of fraud", they must meet the heightened pleading standard of Rule 9(b). *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("Rule 9(b) applies to 'averments of fraud', not claims of fraud").[23] Plaintiffs must "specify each statement alleged to have been misleading" and state with particularity the "reason or reasons why the statement is misleading". *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 9(b). Plaintiffs' federal claims are also subject to the heightened pleading standard of the PSLRA, which requires that Plaintiffs' allegations be set forth with particularity and, where applicable, give rise to a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 322-23 (2007); *see also Cornielsen*, 916 F.3d at 598, 601-02 (applying heightened standard because "fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it" (internal quotation marks omitted)).

I.    PLAINTIFFS' FEDERAL AND COMMON LAW FRAUD CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT PLEAD ACTIONABLE MISSTATEMENTS OR OMISSIONS.

To plead falsity, a complaint must state with particularity each statement alleged to have been misleading, the reason(s) why the statement is misleading and all facts forming plaintiff's belief. 15 U.S.C. § 78u-4(b)(1)(B); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1162-63 (N.D. Ill. 2004). A violation premised on misstatements cannot occur unless an alleged material misstatement was "false when made". *Conlee v. WMS Indus., Inc.*, 2013 WL 1767648,

---

[23] *See also Oakland Cty. Emps.' Ret. Sys. v. Massaro*, 736 F. Supp. 2d 1181, 1185 (N.D. Ill. 2010) (same); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 440-41 (S.D.N.Y. 2014) (applying Rule 9(b) to a Section 18(a) claim sounding in fraud).

at *6 (N.D. Ill. Apr. 24, 2013); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990)

(stating that plaintiffs may not plead "fraud by hindsight" (internal quotation marks omitted)).

Courts have dismissed securities fraud claims that are based on a failure to disclose

regulatory non-compliance. In *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001),

Abbott made eight public statements during the alleged class period (including 10-Qs, earnings

releases, merger announcements and a proxy statement) that failed to disclose "ongoing

compliance issues with the FDA"—including a warning letter and a separate Form 483. *Id*.

at 900-01. When the issues were ultimately disclosed, Abbott maintained its "belie[f] that it

[wa]s in substantial compliance with [FDA] regulations". *Id*. (internal quotation marks omitted).

Five weeks later, Abbott entered into a consent decree with FDA, agreeing to a $100 million fine

and the withdrawal of 125 products from the market. *Id*. at 901. The District Court dismissed a

Section 10(b) complaint based on Abbott's omissions, finding its public statements were not

misleading, the omitted information was not material and the defendants had failed to establish a

strong inference of scienter. *Id*. at 902-11. The Seventh Circuit affirmed, holding: "What sinks

plaintiffs' position is their inability to identify any false statement—or for that matter any

truthful statement made misleading by the omission of news about the FDA's demands".

*Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) (Easterbrook, J.).

*Stryker*, 865 F. Supp. 2d 811, is similar. In that case, after years of patient complaints,

medical device manufacturer Stryker received three FDA warning letters at separate facilities,

forcing it to undertake an expensive product recall and adopt a global quality improvement plan

costing $50 million per year for three years. *Id*. at 816-18. The court dismissed a Section 10(b)

complaint, finding Stryker had made no materially false or misleading statements, plaintiffs had

not pled a strong inference of scienter and, in light of a nationwide recession, plaintiffs likely had

11

not adequately pled loss causation.  *Id*. at  823-33, 835.

Several important principles emerge from these cases.

*First*, there is no duty to disclose regulatory non-compliance.  As Judge Easterbrook emphasized in *Gallagher*:  "We do not have a system of continuous disclosure.  Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."  269 F.3d at 808.  "Rule 10b-5 condemns only fraud, and a corporation does not commit fraud by standing on its rights under a periodic-disclosure system."  *Id*. at 809-10.[24]

*Second*, while a duty to disclose "can arise ... if omitting particular facts makes some existing statement misleading", "[m]erely mentioning a topic ... does not require the company to disclose every tangentially related fact that might interest investors".  *Anderson*, 140 F. Supp. 2d at 903.  For example, undisclosed regulatory challenges generally do not make statements "focus[ed] on general corporate performance, progress on specific products, ... new acquisitions and the pharmaceutical business" fraudulent.  *Id*. at 907.  Moreover, prior or contemporaneous disclosures of the same or similar information will foreclose a material omission claim. *See Gaines v. Guidant Corp.*, 2004 WL 2538374, at *15 (S.D. Ind. Nov. 8, 2004).

*Third*, only the regulatory agency can make a formal determination of regulatory status. A failure to disclose internal reports of non-compliance or non-final agency findings is not securities fraud.  *See Stryker*, 865 F. Supp. at 825 (finding "no duty to disclose the Cork Form 483, nor did it render the compliance statement false or misleading....  FDA does not consider observations contained in a Form 483 as a final agency determination of noncompliance.  The

---

[24] "[A]bsent a duty to speak", it is "axiomatic ... that an alleged omission cannot be fraudulent".  *See Rosenbaum v. White*, 692 F.3d 593, 605 (7th Cir. 2012) (internal quotation marks omitted); *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *see also Di Rito v. Metropolitan Life Ins. Co.*, 2018 WL 6769317, at *4, 6 (Ill. App. Ct. Dec. 24, 2018) (substantially the same for common law fraud under Illinois law).

Form 483 thus was not the final word on whether the Cork facility was in compliance with FDA regulations."); *id.* ("'continual' patient complaints" did not render statements misleading).[25]

*Fourth*, there is no duty to publicly predict formal regulatory findings that have not yet occurred. *See Gallagher*, 269 F.3d at 810 ("The 10-K report was filed on March 9, 1999, and the FDA's letter is dated March 17, eight days later. Unless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written."); *Anderson*, 140 F. Supp. 2d at 904 ("Plaintiffs seem to argue that because Abbott entered the consent decree on November 2, defendants must have known that they would face sanctions. But temporal proximity alone, between the positive statement and the negative event, is insufficient.").

*Fifth*, an agency finding of non-compliance does not give rise to a duty to correct earlier public statements unless those statements were false *when made*. *See Gallagher*, 269 F.3d at 810 ("[P]laintiffs insist that Abbott had a 'duty to correct' the 10-K report. Yet a statement may be 'corrected' only if it was *in*correct when made, and nothing said as of March 9 was incorrect.").

*Sixth*, in most instances, statements of regulatory compliance are opinion statements, which are not actionable unless they were either (i) *knowingly* false when made or "the supporting facts supplied were untrue"; or (ii) the statement omitted information "whose omission" made the statement "misleading to a reasonable" investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327, 1332 (2015).[26] Establishing liability for statements of opinion is "no small task" as "[r]easonable investors understand that

---

[25] *See also In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (noting that Forms 483 contain advisory language clarifying that "the circumstances noted therein are merely observational in nature, and do not represent the FDA's final word").

[26] *See also Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 566-67 (S.D.N.Y. 2018); *Petrakopoulou v. DHR Int'l, Inc.*, 590 F. Supp. 2d 1013, 1019 (N.D. Ill. 2008) (substantially the same for common law fraud under Illinois law).

opinions sometimes rest on a weighing of competing facts" and do "not expect that *every* fact known to an issuer supports its opinion". *Omnicare*, 135 S. Ct. at 1329, 1332. The securities laws do not "impose liability merely because an issuer failed to disclose information that ran counter to [the] opinion expressed". *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (opinion statement inactionable even though "Plaintiffs would have been interested in knowing about the FDA feedback, and perhaps would have acted otherwise had the feedback been disclosed"). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* at 210; *Xerox*, 300 F. Supp. 3d at 567 (same).

*Seventh*, forward-looking predictions as to a regulatory problem's impact are not actionable if *either* (i) "the statement is identified as [] forward-looking ... and is accompanied by meaningful cautionary statements";[27] *or* (ii) the statement was made without actual knowledge that it was false or misleading. 15 U.S.C. § 78u5(c)(1)(A)-(B).[28]

*Eighth*, the securities laws do not obligate companies to confess to regulatory findings that it contests in good faith. A defendant's "maintenance of its innocence is not fraud. SEC rules do not create a duty to confess contested charges." *Anderson*, 140 F. Supp. 2d at 906.

> "A [defendant] should not be placed in a position of being forced to either admit liability, while he or she disputes it, or violate the securities law by failing to disclose the alleged and disputed violation. As long as the [defendant] discloses to the ... shareholders that a good faith dispute exists as to an alleged violation of law, a shareholder has sufficient information to make a rational and informed

---

[27] Language is "meaningful" and "cautionary" if it notifies investors of the investment's danger, permitting her to make an informed decision consistent with her own risk preferences. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842-43 (N.D. Ill. 2003); *Brasher v. Broadwind Energy, Inc.*, 2012 WL 1357699, at *18 (N.D. Ill. Apr. 19, 2012). Cautionary language need not list all facts that *might* affect results, nor must it "explicitly refer to the risk that ultimately caused the projection to differ from actual results; it is sufficient that the language warned of risks 'of a significance similar to that actually realized.'" *Stavros*, 266 F. Supp. 2d at 843 (internal citation omitted).

[28] *Stavros*, 266 F. Supp. 2d at 842-43; *see also Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 92 (Ill. App. Ct. 2002) (substantially the same for common law fraud under Illinois law).

decision." *Id*. at 907 (quoting *City Capital Assoc. v. Interco, Inc.*, 696 F. Supp. 1551 (D. Del. 1988)).

*Ninth*, general statements of corporate optimism are not transformed into securities fraud merely because the speaker failed to disclose regulatory challenges. *Stryker*, 865 F. Supp. 2d at 822 ("[S]tatements that constitute immaterial puffery are not actionable because such loosely optimistic statements [are] insufficiently specific for a reasonable investor to find them important to the total mix of information available." (internal quotation marks and citation omitted)).[29] Thus, statements that a "[c]ompany remains committed to ... manufacturing ... medical products that are safe and effective and that comply with applicable laws and regulations, including those administered by the FDA" are puffery. *Id.* at 829 (internal quotation marks omitted).

These principles make clear that Plaintiffs' allegations of falsity fail as a matter of law. Plaintiffs challenge six categories of statements: (i) statements concerning Akorn's compliance with FDA regulations; (ii) statements concerning the regulatory status of Akorn facilities; (iii) statements concerning Akorn's ANDA pipeline; (iv) the Ordinary Course Covenant in the Fresenius Merger Agreement; (v) statements concerning Akorn's data integrity investigation; and (vi) statements concerning Akorn's disclosure controls. As set forth below, each fails.

## A. Statements Concerning Compliance with FDA Regulations

Plaintiffs allege "Defendants [m]isrepresent[ed] Akorn's [c]ompliance with FDA [r]egulations", challenging four sets of alleged misstatements. (*Twin* at p. 37; *Manikay* at p. 36.)

---

[29] Statements of corporate optimism (or "puffery") are not actionable because they are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available" and are therefore "immaterial as a matter of law". *Teamsters Affiliates Pension Plan v. Walgreen Co.*, 2010 WL 3894149, at *4 (N.D. Ill. Sept. 29, 2010) (internal quotation marks omitted); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011) (finding such "rosy affirmation[s]" inactionable (internal quotation marks omitted)); *see also Donovan v. ABC-NACO Inc.*, 2002 WL 1553259, at *7 (N.D. Ill. July 15, 2002) (substantially the same for common law fraud under Illinois law).

Each fails because the challenged statements were accurate when made, Defendants are not required to accuse themselves of non-compliance or predict future FDA determinations and many of the challenged statements are inactionable forward-looking statements or puffery.

        1.     <u>The risk disclosures were accurate and implied nothing about whether the risks had materialized.</u>

Certain of Akorn's quarterly and annual reports contain the following risk disclosure:

> "'We are subject to extensive government regulations which if ... we are not in compliance with, could increase our costs, subject us to various obligations and fines, or prevent us from selling our products or operating our facilities.'" (*Twin* ¶ 144; *Manikay* ¶ 143.)

This statement was not misleading for two reasons.

*First*, no reasonable investor would interpret the risk disclosure as an assertion of full regulatory compliance. As in *Anderson*, the risk disclosure was a "statement of what the government regulates and what sanctions it can impose. All this information could be gleaned from the C.F.R. It says nothing company-specific, and no reasonable investor would infer anything about the state of [Akorn's] FDA compliance." *Anderson*, 140 F. Supp. 2d at 905.

*Second*, even if the statements did imply compliance, they were not misleading because Akorn *was* in compliance when they were made. Plaintiffs do not identify any final FDA finding of noncompliance during the relevant period; and Defendants were under no obligation in 2016-18 to publicly predict FDA warning letters that were not received until 2019. *See Gallagher*, 269 F.3d at 810 (no duty to predict warning letter received after a 10-K containing a risk disclosure).[30]

---

[30] *See also Stryker*, 865 F. Supp. 2d at 825 (even a Form 483 is insufficient to render risk disclosures misleading because "FDA does not consider observations contained in a Form 483 as a final agency determination of noncompliance"); *see also Anderson*, 140 F. Supp. 2d at 902 (warnings from FDA are not material absent some indication that FDA intends to take material action).

2.      Item 303 neither provides a private cause of action nor requires companies to engage in self-flagellation.

Plaintiffs next allege that certain of Akorn's SEC filings were "misleading because they failed to disclose the Company's regulatory noncompliance in violation of Item 303". (*Twin* ¶ 146; *Manikay* ¶ 145.) Item 303 requires issuers to, among other things, "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs' argument fails for three reasons.

*First*, Item 303 does not create an independent right of action if the elements of a Section 10(b) claim have not otherwise been met. *See Anderson*, 140 F. Supp. 2d at 909 ("Item 303(a) does not give rise to private action under Rule 10b .... Absent some other basis for the duty, plaintiffs cannot rely solely on Item 303(a).").[31]

*Second*, even if Item 303 were actionable, Plaintiffs have not pled with particularity any "*known* trends ... that [Akorn] reasonably *expect[ed]* w[ould] have a material ... unfavorable impact*" on its sales, revenues or income. 17 C.F.R. § 229.303(a)(3)(ii) (emphases added). While Plaintiffs point to findings of noncompliance in Akorn's internal audit reports, they have pleaded no facts showing that Akorn *expected* FDA to take enforcement action with respect to those findings or *expected* the impact on sales, revenues or income to be material. There was no "known trend" to disclose.[32] *See Gallagher*, 269 F.3d at 807, 810 (FDA correspondence about

---

[31] *See also Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375, at *14 (N.D. Ill. Sept. 30, 2016) (same); *Brasher*, 2012 WL 1357699, at *13 (same); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054-55 (9th Cir. 2014) (same) (citing *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.)).

[32] Plaintiffs' allegations that Mark Silverberg, Akorn's then-EVP Global Quality, knowingly submitted fraudulent data to FDA do not change this fact. (*E.g. Twin* ¶ 145; *Manikay* ¶ 144.) Akorn is deemed to have "the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally ... the collective knowledge of all the corporation's

regulatory violations immaterial until FDA threatened "severe consequences").

*Third*, even if Item 303 were privately enforceable, and even if Plaintiffs had alleged known trends, Defendants had no duty to accuse themselves of uncharged wrongdoing in public filings. Plaintiffs assert that Defendants "should have disclosed that Akorn was engaged in rampant and widespread noncompliance with FDA regulations across all of its facilities". (*Twin* ¶ 146; *Manikay* ¶ 145.) But it is well-established that "federal securities laws do not require a company to accuse itself of wrongdoing". *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 2798525, at *5 (N.D. Cal. June 28, 2017) (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (collecting cases)).[33] "Defendants' culpability ... does not become a fact that must be disclosed until it is at least charged ... or proven". *In re Teledyne Def. Contracting Deriv. Litig.*, 849 F. Supp. 1369, 1383 (C.D. Cal. 1993).[34] Moreover, FDA does not review internal audits: "The intent of the policy is to encourage firms to conduct quality assurance program audits and inspections that are candid and meaningful."[35] This policy would be undermined, and robust internal monitoring chilled, if internal audit findings triggered public disclosure obligations and possible securities liability.

---

officers". *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) (internal quotation marks and citation omitted); *Pugh*, 521 F.3d at 697 (same). Because Plaintiffs have not alleged that Silverberg (i) made or issued any of the allegedly false statements or (ii) ordered, approved or furnished information for inclusion in any of those statements, his knowledge is not attributable to Akorn.

[33] *See also Anderson*, 140 F. Supp. 2d 894 at 906 ("SEC rules do not create a duty to confess contested charges.").

[34] *See also Volkswagen*, 2017 WL 2798525, at *5; *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995) (no duty to disclose possible future inspection by regulator); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 248 (E.D.N.Y. 1989) (finding "'imminent'" indictment and resulting financial disaster were not "facts" requiring disclosure while investigation was pending).

[35] FDA Comp. Policy Guide § 130.300.

18

3. The regulatory representation was an allocation of risk between private parties, not a statement of fact, and was true when made.

Plaintiffs' challenge to the regulatory compliance representation and warranty in the Merger Agreement (*Twin* ¶¶ 147-150; *Manikay* ¶¶ 146-49) also fails.

*First*, investors were told explicitly that these representations were negotiated risk allocations, *not* statements of fact. Akorn disclosed that: (1) the representations and warranties were "solely for the benefit of [Fresenius]" and "only for purposes of the Merger Agreement"; (2) they were "subject to materiality qualifications ... which may differ from what may be viewed as material by investors"; (3) they were "included in the Merger Agreement for the purpose of allocating risk ... rather than establishing matters as facts"; (4) they were not made "to provide investors with any ... factual information"; (5) "information concerning the subject matter of the representations and warranties may change ... [and] may or may not be fully reflected in [Akorn's] public disclosures"; and (6) "[i]nvestors should not rely on the representations and warranties ... as characterizations of the actual state of facts or condition of [Akorn]".[36] Rule 10b-5 condemns only untrue or misleading "statement[s] of ... material fact". 17 C.F.R. § 240.10b-5(b). Given these warnings, no reasonable investor could interpret the Merger Agreement's representations and warranties as statements of material fact.[37]

*Second*, Plaintiffs have failed to allege that the Regulatory Representation was false *when made*—at signing. *See Conlee*, 2013 WL 1767648, at *6. To make out this claim, Plaintiffs must plead both that Akorn was out of compliance at signing *and* that Akorn's non-compliance

---

[36] Ex. 4, April 24, 2017 8-K at 3.

[37] *See In re Plains All American Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 638 (S.D. Tex. 2018) ("The context of the statements indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public. Because Statements 15 and 16 were made in the context of representations and warranties in underwriting agreements, they are not actionable.").

was so dire that, as of signing, it would reasonably be expected to cause a Regulatory MAE.[38]

They have not and cannot make that allegation: the Chancery Court observed that "many of the

events giving rise to the Regulatory MAE had not yet occurred at the time of signing".[39]

> 4. The policy statements on Akorn's website were inactionable puffery.

Plaintiffs allege that certain statements on Akorn's website—including policy statements,

mission statements and statements relating to regulatory compliance—were misleading. (*See*

*Twin* ¶¶ 151-52; *Manikay* ¶¶ 150-51.) Plaintiffs challenge, for example, statements concerning

Akorn's "'commitment to lawful conduct of its business'" (*Twin* ¶ 151; *Manikay* ¶ 150), and to

having "the right people doing the right things, the first time, every time" (*Twin* ¶ 152; *Manikay*

¶ 151). Such "general declarations about the importance of acting lawfully and with integrity"

are inactionable puffery. *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).[40]

## B. Statements Concerning Manufacturing Facilities

Plaintiffs allege Defendants discussed "FDA's inspection and approval of manufacturing

facilities" and "stated that Akorn's '[r]esearch and development expertise' and its

'manufacturing expertise' were two of its five competitive strengths". (*Twin* ¶¶ 156-57;

*Manikay* ¶¶ 155-56.) These were either indisputably true when made or inactionable puffery.

> 1. Defendants accurately disclosed the results of FDA facility inspections without touting Akorn's quality prowess.

Akorn's 2016 10-K disclosed that "'all of our FDA approved facilities ... ultimately

received satisfactory status from the FDA'". (*Twin* ¶ 154; *Manikay* ¶ 153.) Similarly, its 2017

---

[38] Ex. 4, Merger Agreement § 3.18.

[39] *Fresenius*, 2018 WL 4719347, at *81.

[40] *See also Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 932 (N.D. Ill. 2011) ("[A] code of ethics is inherently aspirational." (internal quotation marks omitted)).

10-K disclosed that "'all of our FDA approved facilities ... are in good standing with the FDA'". (*Twin* ¶ 155; *Manikay* ¶ 154.)  These statements were truthful.  FDA *did* inspect certain Akorn facilities in those years and found them compliant.  Plaintiffs do not allege otherwise.

No reasonable investor would interpret the statements to imply anything further, as Defendants did not promote or otherwise emphasize Akorn's quality compliance.  Defendants "did not claim to have any particular regulatory prowess", "did not represent [Akorn] as having an abnormally strong compliance record", did not "specifically attribute [Akorn's] past success to outstanding quality control", "did not assert that [Akorn] was in full compliance with all regulations", and did not claim "that [Akorn] had no outstanding regulatory issues".  *Anderson*, 140 F. Supp. 2d at 904, 906.  They "merely reported specific FDA actions, *i.e.*, approvals of particular [facilities]".  *Id.* at 906.  That is not misleading.  In fact, Akorn repeatedly warned that there was a risk that future inspections might have different results.  (*See* Argument Section I.A.1.)

2.  Statements concerning Akorn's competitive strengths were the type of generalized, positive remarks that courts routinely classify as puffery.

According to Plaintiffs, Akorn's 2016 and 2017 10-Ks disclosed that "Akorn's '[R&D] expertise' and its 'manufacturing expertise' were two of its five competitive strengths".  (*Twin* ¶ 157; *Manikay* ¶ 156.)  These are textbook examples of puffery.[41]  They are also protected opinion statements, which are not actionable unless *knowingly* false when made, *see Carvelli v. Ocwen Fin. Corp.*, 2019 WL 3819305, at *9 (11th Cir. Aug. 15, 2019) (dismissing claims related

---

[41] *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018) (finding immaterial statements that the defendant's "'knowledge, experience, and scientific resources provide [the defendant] with competitive advantages'"); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("[G]eneralized, positive statements about the company's competitive strengths ... are not actionable because they are immaterial."); *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 461 (N.D. Tex. 2018) (same); *Anderson*, 140 F. Supp. 2d at 905 ("Vague statements about industry leadership and unquantified growth are classic puffery").

to statements of opinion concerning a company's "competitive strengths" because the complaint failed to allege the speaker "didn't actually believe" the statements), or omit information making them misleading in context, *Omnicare*, 135 S. Ct. at 1327-29. Plaintiffs have not pleaded any facts suggesting that Akorn did not subjectively believe its R&D and manufacturing expertise to be competitive strengths or facts that were omitted from the statements that rendered them misleading in context. *See Tongue*, 816 F.3d at 212.

### 3. Statements concerning an FDA re-inspection of Decatur were true and made before the facts Plaintiffs allege caused them to be misleading.

Plaintiffs challenge Akorn's November 2016 statements that, after receipt of the earlier Form 483, "there is no remediation per se that we have to do at our Decatur site" and "there's nothing really more for us to do other than just operate under cGMP type standards"; its December 2016 announcement that FDA had re-inspected Decatur "with no Form 483 observations"; and its March 2017 statement that Decatur had received NAI status after FDA's re-inspection. (*Twin* ¶ 159; *Manikay* ¶ 158.) None of these statements was misleading.

Plaintiffs quote the November statements out of context. The statements came in response to analyst questions concerning Decatur's readiness for re-inspection following the Form 483 FDA issued in June 2016.[42] Plaintiffs do not dispute that, within weeks after the statements were made, FDA in fact *did* re-inspect Decatur and determined that it *was* in fact compliant. (*Twin* ¶ 159(c); *Manikay* ¶ 158(c).) Nor do they allege that Akorn was required to take additional, undisclosed remediation steps. The statements were truthful when made.

Plaintiffs assert that the November statements were misleading because external consultant "Cerulean had conducted an inspection of Decatur and provided Akorn with a report

---

[42] *See* Ex. 6, 2016 Q3 Earnings Tr. at 8-10; Ex. 7, Piper Jaffray Healthcare Conf. Tr. at 3 (Nov. 29, 2016).

that disclosed [several] ... data-integrity nonconformities". (*Twin* ¶ 160; *Manikay* ¶ 159.) But

Akorn did not receive Cerulean's report until *December 2016* (*Twin* ¶ 88; *Manikay* ¶ 87)—after

the November 2016 statements.[43] In any event, FDA—which had just found Decatur NAI (*Twin*

¶ 159; *Manikay* ¶ 158)—has the final say on Akorn's compliance, not a consultant.

### C.    Statements About Akorn's ANDA Pipeline

Plaintiffs assert that Defendants "sp[oke] about Akorn's pipeline and assure[d] investors

that new ANDA approvals were coming down the pike". (*Twin* ¶ 165; *Manikay* ¶ 164.) But to

the extent that any of the alleged statements were statements of fact, they were accurate on their

face, and Plaintiffs do not argue otherwise. For example:

- "As of the end of 2016, our pending ANDA count stood at 92 filings". (*Twin* ¶ 161; *Manikay* ¶ 160.)

- "[Akorn has over] 75 additional ANDAs in various stages of development". (*Twin* ¶ 162; *Manikay* ¶ 161.)

- "[Akorn] has received approval from [FDA] ... for its [ANDA] ... for Mycophenolate Mofetil for Injection, USP, 500 mg/vial". (*Twin* ¶ 163; *Manikay* ¶ 162.)

Plaintiff does not allege facts indicating that the cited numbers of ANDAs were wrong or that

Akorn did not, in fact, receive approval for Mycophenolate Mofetil. Those statements were true.

Moreover, many of the alleged statements are forward-looking statements protected by

the statutory safe harbor of the PSLRA and the bespeaks caution doctrine. For example:

- "[W]e have a large pipeline of . . . *planned* launches". (*Twin* ¶ 161 (emphasis added); *Manikay* ¶ 160.)

- "[W]e should now *expect* to receive approvals for other filings". (*Twin* ¶ 164 (emphasis added); *Manikay* ¶ 163.)

---

[43] *See Gallagher*, 269 F.3d at 810 ("Unless Abbott had a time machine, it could not have described ... a letter that had yet to be written"); *DiLeo*, 901 F.2d at 628 (plaintiffs cannot rely on "fraud by hindsight").

23

- "[I]t's *hard to project and predict* the timing of the approvals, but knowing in terms of the feedback that we received from the FDA on our filings and the type of questions and queries that we're receiving, we *feel* very comfortable that *we can get* through getting our products approved this year more than ever". (Ex. 8, 2016 Q4 Earnings Tr. at 10 (emphases added); *see Twin* ¶ 164; *Manikay* ¶ 163.)

These statements fall squarely into the PSLRA's definition of forward-looking statements.[44] Moreover, they were identified as forward-looking,[45] and accompanied by meaningful cautionary language.[46] Finally, even had there not been cautionary language, the alleged statements would still be protected because Plaintiffs have failed adequately to allege that the "speaker had no reasonable basis for the [statements] when made". *Anderson*, 140 F. Supp. 2d at 904.[47] Plaintiffs have alleged no prior indication by FDA that Akorn should expect any delays in product approvals. *See Gallagher*, 269 F.3d at 807, 810.

Finally, many of the alleged statements are puffery. For example, statements about "our deep ANDA pipeline" (*Twin* ¶ 161; *Manikay* ¶ 160); "[a] large pipeline of pending ANDAs"

---

[44] *See* 15 U.S.C. § 78u-5; *Anderson*, 140 F. Supp. 2d at 906 (finding statements concerning "[the] state of our new product cycle" and the issuer's "full[]" pipeline to be protected forward-looking statements).

[45] Ex. 9, Akorn Investor Presentation, J.P. Morgan Healthcare Conf. at 2 (Jan. 9, 2017) (noting forward-looking statements that use words such as "expect", "plan" and "project"); Ex. 10, J.P. Morgan Healthcare Conf. Tr. at 2 (Jan. 9, 2017) (referring audience to disclaimer). Ex. 8, Akorn 2016 Q4 Earnings Tr. at 4 (identifying statements as forward-looking and referring to Akorn Q4 Press Release containing detailed disclaimers); *see* Ex. 11, March 1, 2017 8-K, ex. 99.1 at 4.

[46] Ex. 9, Akorn Investor Presentation, J.P. Morgan Healthcare Conf. at 2 (Jan. 9, 2017) (warning statements regarding Akorn's ANDA pipeline were subject to enumerated risks and uncertainties); Ex. 8, 2016 Q4 Earnings Tr. at 10 ("[I]t's hard to project and predict the timing of the approvals."); Ex. 11, March 1, 2017 8-K, ex. 99.1 at 4 (warning actual results may differ materially because of "the difficulty of predicting the timing or outcome of product development efforts"); Ex. 12, 2015 Form 10-K ("FDA approval ... is never certain. Our new products could take a significantly longer time than we expect to gain regulatory approval and may never gain approval."); s*ee Stavros*, 266 F. Supp. 2d at 844 (considering cautionary language in both the forward-looking statements and in SEC filings).

[47] *See also Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *16 (S.D. Ind. Jan. 4, 2016) ("[Officers and directors are] 'not required to take a gloomy, fearful or defeatist view of the future' but [are] instead 'expected to be confident about their stewardship and the prospects of the business that they manage.'").

(*Twin* ¶ 162; *Manikay* ¶ 161); and "getting ... products approved this year more than ever" (*Twin* ¶ 164; *Manikay* ¶ 163) are clearly puffery.[48]

### D.    Akorn's Contractual Commitment to Operate in the Ordinary Course

Section 5.01 of the Merger Agreement (which was filed with the SEC on Form 8-K) contained a customary "ordinary course" covenant providing that "[Akorn] shall ... use its ... commercially reasonable efforts to carry on its business in all material respects in the ordinary course of business" between signing and closing.[49]  Plaintiffs allege that this contractual covenant was misleading because "Akorn did not operate its business in the ordinary course in all material respects after the Merger Agreement was signed".  (*Twin* ¶ 167; *Manikay* ¶ 166.)

This allegation fails because Akorn's Ordinary Course Covenant was not a "statement of a material fact" within the meaning of Rule 10b-5.  *See* 17 C.F.R. § 240.10b-5(b).  It was a contractual promise of future performance, which "typically does not constitute a misrepresentation that will support an action for fraud".  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 694 (9th Cir. 2011); *see also IDT Corp. v. eGlobe, Inc.*, 140 F. Supp. 2d 30, 35 (D.D.C. 2001) (same).  Only where the promisor "intended not to perform or knew that he could not perform" *at the time the promise was made*, will a breach of contract support a Section 10(b) claim.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).  Plaintiffs offer no such allegations.  They assert only that Akorn breached its covenant at some later date.  Moreover, Akorn warned investors that a failure of the Merger's closing conditions—including breaches of covenants—was a risk.  (*Twin* ¶ 168; *Manikay* ¶ 167.)

---

[48] *See Walgreen*, 2010 WL 3894149, at *4 (finding inactionable "loosely optimistic statements that are ... vague [and] ... lacking in specificity"); *Anderson*, 140 F. Supp. 2d at 906 (dismissing as puffery the statement "[w]e expect this [growth] to continue ... due to the unprecedented state of our new product cycle.... [Our] diagnostic pipeline is fuller than ever before").

[49] Ex. 4, Merger Agreement § 5.01.

### E.  Statements Concerning the Data Integrity Investigations

Plaintiffs challenge statements in two February 2018 press releases about Akorn's data integrity investigation.  (*Twin* ¶¶ 168-71; *Manikay* ¶¶ 167-70.)

The challenged statements are forward-looking:

- "*To date*, the Company's investigation has not found any facts that *would result* in a material impact on Akorn's operations and the Company does not believe this investigation *should* affect the closing of the transaction with Fresenius."  (*Twin* ¶ 169 (first emphasis added); *Manikay* ¶ 168.)

- "The ... investigation ... has not found any facts that *would result* in a material adverse effect on Akorn's business".  (*Twin* ¶ 170 (emphasis modified); *Manikay* ¶ 169.)

- "We *intend* to vigorously enforce our rights, and Fresenius' obligations, under our binding merger agreement."  (*Twin* ¶ 170 (emphasis added); *Manikay* ¶ 169.)

These statements make predictions about the future impact Akorn's findings would have on its operations and the planned Merger.  They are protected because Defendants expressly identified their assessment of the investigative findings as "forward-looking" and informed shareholders that the actual results could differ materially from such assessment:

> "This communication contains forward-looking statements ....  Readers can identify these statements by forward-looking words such as 'may,' 'could,' '*should*,' '*would*,' '*intend*,' 'will,' 'expect,' 'anticipate,' 'believe,' 'estimate,' 'continue' or similar words.  A number of important factors could cause actual results of the Company and its subsidiaries to differ materially from those indicated by such forward-looking statements. These factors include, but are not limited to, ... (vii) *the outcome of the above described investigation and any actions taken by the Company, third parties or the FDA as a result of such investigation* ...."[50]

Additionally, "the risks were abundantly apparent on the statement's face", particularly in light of Fresenius's contemporaneous press release.  *See Anderson*, 140 F. Supp. 2d at 907.[51]

---

[50] Ex. 13, February 27, 2018 8-K, ex. 99.1 (emphasis added).

[51] *See also Société Générale Sec. Serv., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) ("In this context, a reasonable investor is not likely to find the statements misleading unless they ignore these disclosures.").

Furthermore, Akorn was not required to confess or accuse itself publicly of wrongdoing—which it would vigorously contest in the ensuing litigation with Fresenius. "[M]aintenance of ... innocence is not fraud" and "SEC rules do not create a duty to confess contested charges". *Anderson*, 140 F. Supp. 2d at 906-07. "Where there exists a good faith dispute as to facts or an alleged legal violation, the [law] only requires disclosure of the dispute" because "[i]nvestors can evaluate this sort of posturing for what it is worth". *Id*.

Moreover, the challenged statements are opinions. For example:

- "[T]he Company does not *believe* this investigation should affect the closing of the transaction with Fresenius". (*Twin* ¶ 131 (emphasis modified); *Manikay* ¶ 130.)

- "We categorically *disagree* with Fresenius' accusations." (*Twin* ¶ 134 (emphasis added); *Manikay* ¶ 133.)

Plaintiffs have not alleged facts suggesting Akorn's stated belief to have been insincere. *See Omnicare*, 135 S. Ct. at 1327. By definition, the representations and warranties at issue were not false unless an MAE had occurred[52]—a finding no Delaware court had ever made.[53] Plaintiffs have alleged no facts suggesting that in February 2018 Akorn subjectively believed its regulatory status had given rise to the first MAE in Delaware history. "What [Plaintiffs are] really asking is that [Defendants] be required to admit liability for uncharged, unadjudicated claims while [an] investigation into [their] ... position [is] ongoing. That sort of confession of guilt is not required." *Caterpillar*, 2018 WL 4616356, at *5.

---

[52] Ex. 4, Merger Agreement § 3.18.

[53] Notably, six months *after* the February 2018 press releases, after months of extensive discovery, a week-long trial with thousands of trial exhibits, hundreds of pages of briefing and post-trial argument, the Chancery Court told the parties that it "d[id not] view this as an easy case.... [N]obody should think that they have a clean winner here, by any means". Ex. 14, Hr'g Tr. 199:14-200:20 (Aug. 23, 2018). This Court may take judicial notice of publicly available transcripts from related trials. *Ojo v. Luong*, 2016 WL 1337274, at *4 (D.N.J. Apr. 5, 2016); *Robinson v. Purcell Const. Corp.*, 2015 WL 5603022, at *7 (N.D.N.Y. Sept. 22, 2015); *Pelosi v. Spota*, 607 F. Supp. 2d 366, 371 (E.D.N.Y. 2009); *see also Twin* ¶¶ 140, 216; *Manikay* ¶ 139.

Finally, Defendants' opinions did not omit information "whose omission ma[de] ... the statement[s] ... misleading". *See Omnicare*, 135 S. Ct. at 1332. Plaintiffs' allegations to the contrary rely on developments that had not occurred at the time these statements were made. Plaintiffs fail to plead any facts suggesting that, *as of February 26, 2018*: (i) FDA had already taken adverse action against Akorn (it had not); (ii) Akorn's quality consultant, NSF International, had already started its investigation (it had not),[54] or (iii) Akorn had knowledge of Fresenius's investigative findings (it did not). Even as late as April 23, 2018, the only thing Plaintiffs allege to have changed is that NSF International had begun work. (*Twin* ¶ 124; *Manikay* ¶ 123.) A plaintiff cannot plead "fraud by hindsight". *See DiLeo*, 901 F.2d at 628.

### F.    Statements Concerning Akorn's Disclosure Controls

Plaintiffs allege that "Akorn did not have effective disclosure controls and procedures" and that it falsely certified the strength of its internal controls. (*Twin* ¶¶ 172-81; *Manikay* ¶¶ 171-79.) This claim fails for two reasons.

*First*, Plaintiffs have failed to explain why the challenged statements were false. They offer no particularized allegations concerning Akorn's system of internal controls, other than to argue, in essence, that they "*must* have been inadequate because they failed to ensure" that Akorn reported alleged FDA noncompliance. *See Rex & Roberta Ling Living Tr. v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 405 (S.D.N.Y. 2018). Such "conclusory assertions without any factual support" are insufficient to make out a disclosure controls claim. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (internal quotation marks omitted). The Complaints do not describe Akorn's internal controls, "let alone [] identify why that system was

---

[54] *Twin* ¶ 124 ("In March 2018, Akorn hired NSF International ('NSF') to conduct an investigation of its data-integrity failures."); *Manikay* ¶ 123.

inadequate". *See B Commc'ns*, 346 F. Supp. 3d at 405; *Gentiva*, 932 F. Supp. 2d at 371.

*Second*, Plaintiffs' theory assumes a reasonable investor would misinterpret the existence of internal controls to detect accounting and bookkeeping improprieties as a guarantee of FDA compliance. To the contrary, accounting and FDA compliance are obviously different functions, employing different people with different expertise. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017); *Gentiva*, 932 F. Supp. 2d at 371 ("Plaintiff does not even challenge the Defendants' accounting in any of the SEC filings").

## II. PLAINTIFFS' EXCHANGE ACT AND COMMON LAW FRAUD CLAIMS FAIL BECAUSE PLAINTIFFS DO NOT PLEAD LOSS CAUSATION.

To survive a motion to dismiss, Plaintiffs must "allege that it was the very facts about which the defendant lied which caused its injuries". *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (internal quotation marks omitted).[55] "[T]he complaint must '"specify" each misleading statement' ... and that there must be 'a causal connection between the material misrepresentation and the loss.'" *Id*. (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)). Here, Plaintiffs have failed to, and cannot, plead facts showing that their losses are attributable to the allegedly false statements, and not the failure of the Merger—which the Chancery Court found independently caused by a Financial MAE. Put differently, the Financial MAE means the Merger would have failed—and Plaintiffs

---

[55] *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (Plaintiffs must "allege[] facts sufficient to support an inference that it was ... fraud—rather than other salient factors—that proximately caused [their] losses"); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) (stating that loss causation must be pleaded "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists"); *see also Tricontinental*, 475 F.3d at 844 ("[L]oss causation [is an] element[] of fraud under Illinois law").

would have incurred their losses—irrespective of the allegedly false statements.[56]

Almost immediately after the Merger was announced, and throughout the relevant period, Akorn experienced a steep decline in financial performance having nothing to do with any alleged data integrity issues.[57] As the Chancery Court found in adopting the findings of Fresenius's expert, "Akorn not only vastly underperform[ed] the median and the mean of comparable firms, but it underperform[ed] every single one of the comparable firms on all time periods, on all metrics, which is really dramatic underperformance".[58]

Without the prospect of the Merger, these poor results would have caused a sharp drop in Akorn's share price. But while Fresenius's contractual commitment to acquire Akorn for $34 per share was unthreatened, Akorn's share price was stable. For nearly 10 months, Akorn's share price stayed constant at over $30 per share—just under the agreed acquisition price.

Beginning on February 26, 2018, however, a series of events transpired signaling an increased risk that the deal might fail. While Plaintiffs attempt to characterize these as "corrective disclosures" related to FDA compliance, each of the 2018 disclosures on its face communicated a risk that the promised $34 per share was becoming more unlikely:[59]

---

[56] *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (requiring allegations that "but for the circumstances that the fraud concealed, the investment would not have lost its value" (internal punctuation omitted)).

[57] *Fresenius*, 2018 WL 4719347, at *58 ("The primary driver of Akorn's dismal performance was unexpected new market entrants who competed with Akorn's three top products—ephedrine, clobetasol, and lidocaine. Akorn also unexpectedly lost a key contract to sell progesterone.").

[58] *Id*. at *59 (internal quotation marks omitted).

[59] Twin also alleges that a corrective disclosure occurred on January 9, 2019, when Akorn announced to the market that it had received a warning letter, purportedly causing its share price to fall from $3.94 to $3.48. (*Twin* ¶ 218.) But again this is without merit. Akorn's common stock traded *above* the pre-disclosure price just weeks later on January 24, 2019. This undercuts any inference of loss causation and demonstrates that these alleged regulatory issues were not a significant driver of Akorn's share price and cannot plausibly account for the deterioration in Akorn's stock price over the relevant period. *See In re Immucor, Inc. Sec. Litig.*, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011) ("Plaintiff failed to

| Date | Alleged Corrective Disclosure | Alleged Stock Impact |
|------|-------------------------------|----------------------|
| February 26, 2018 | "'Fresenius is conducting an independent investigation, using external experts, into alleged breaches of FDA data integrity requirements relating to product development at Akorn, Inc. The Management and Supervisory Boards of Fresenius will assess the findings of that investigation. *The consummation of the transaction may be affected if the closing conditions under the merger agreement are not met.*'" (*Twin* ¶ 208 (emphasis added); *Manikay* ¶ 206.) | "Akorn's stock price fell to $18.65 per share, down 38.4% from the previous day's closing price of $30.28 per share." (*Twin* ¶ 209; *Manikay* ¶ 207.) |
| April 22, 2018 | "'*Fresenius has decided today to terminate the company's merger agreement with Akorn, due to Akorn's failure to fulfill several closing conditions.* Fresenius' decision is based on, among other factors, material breaches of FDA data integrity requirements relating to Akorn's operations found during Fresenius' independent investigation.'" (*Twin* ¶ 211 (emphasis added); *Manikay* ¶ 209.) | "Akorn's stock price closed at $13.05 per share, down 33.8% from the previous trading day's closing price of $19.70 per share." (*Twin* ¶ 212; *Manikay* ¶ 210.) |
| May 2, 2018 | "Reuters released an article summarizing the contents of Fresenius's previously sealed court filings." (*Twin* ¶ 215; *Manikay* ¶ 213.) | "On May 2, 2018, [Akorn's stock price] declined by 15%, closing at a price of $12.55 per share." (*Twin* ¶ 215; *Manikay* ¶ 213.) |
| August 23, 2018 | "On August 23, 2018, Vice Chancellor Laster held post-trial oral argument. During the argument, the Vice Chancellor asked questions that led observers to believe and publicly report that things were not going well for Akorn." (*Twin* ¶ 216.) | "Akorn's common stock decreased in price $3.18 per share, or 17.56%, from the prior day's closing price." (*Twin* ¶ 216.) |
| October 1, 2018 | "On October 1, 2018, Vice Chancellor Laster issued his post-trial decision. The court found that Fresenius had validly terminated the Merger Agreement because Akorn violated its compliance representations and its covenant to continue to conduct its business in the ordinary course during the pendency of the merger." (*Twin* ¶ 217.) | "[O]n the prior trading day, September 28, 2018, Akorn common stock closed at a price of $12.98. By the close of trading on October 1, 2018, the stock price closed at $5.36 per share (down 58.71%)." (*Twin* ¶ 217.) |

adequately plead economic loss and loss causation because Immucor's share price quickly rebounded to pre-disclosure levels after each of the FDA-related disclosures.").

Crucially, Plaintiffs' reference to the October 1, 2018 opinion of the Chancery Court omits its third independent ground for authorizing Fresenius's termination: "Because Akorn suffered a General [*i.e.*, Financial] MAE, the [closing] condition in Section 6.02(c) has not been met, and Fresenius cannot be forced to close." *Fresenius*, 2018 WL 4719347, at \*62.

In light of the lost Merger—which was independently caused by a Financial MAE having nothing to do with data integrity—Plaintiffs' conclusory allegations that Defendants' alleged misstatements caused the evaporation of nearly 90% of Akorn's market value are insufficient under the heightened pleading standard.[60]  Plaintiffs bet on a merger, not on the future of a standalone company; they purchased Akorn securities only after news of the Merger leaked into the market.  (*See Twin* Exs. A-C; *Manikay* Exs. A-B.)  They understood fully—as they stated in filings with the SEC—that "[m]erger arbitrage transactions are inherently volatile" and "[i]f the proposed transaction is not consummated ... the value of such securities purchased may decline significantly".[61]  That is precisely what happened here, for reasons having nothing to do with Akorn's regulatory status.  The Financial MAE was indisputably an independent basis for the Chancery Court's holding, meaning the Merger would have failed regardless of Akorn's regulatory status.[62]  Imposing liability would make Defendants the insurer of losses that Plaintiffs would have sustained *regardless of the fraud that they allege* on what Plaintiffs knew to be a highly risky investment—an investment on which Plaintiffs repeatedly doubled down

---

[60] *See Hunter*, 477 F.3d at 187-88 (dismissing for failure to plead loss causation where decline "more logically occurred" because of a contemporaneous lawsuit which "portended a period of instability and discord that could disrupt the corporation's operations"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) (stating that the revelation of an investigation, without more, shows only "that a company's share price can drop suddenly without any evidence or finding of wrongdoing").

[61] Ex. 1, Twin Brochure at 12; *see also* Ex. 2, Manikay Brochure at 11.

[62] *Akorn, Inc. v. Fresenius Kabi AG*, 198 A.3d 724 (Del. 2018) (table).

with full knowledge that it was growing much riskier.

The securities laws do not protect Plaintiffs from investment losses on speculative bets that fail. *See Koplin v. Labe Fed. Sav. & Loan Assoc.*, 748 F. Supp. 1336, 1340 (N.D. Ill. 1990) (denying a claim for lost profits based on "pure speculation"). Plaintiffs' claims fail because they do not and cannot show, as they must, that their investments "would not have lost [their] value" but for Defendants' alleged misstatements concerning data integrity. *See Ray*, 482 F.3d at 995. To the contrary, it is crystal clear that the Akorn securities Plaintiffs purchased would have lost their value regardless of those alleged misstatements, because of Akorn's Financial MAE.

III.   PLAINTIFFS' SECTION 18(a) CLAIMS ARE UNTIMELY AND FAIL
       ADEQUATELY TO ALLEGE ACTUAL RELIANCE.

Plaintiffs' Section 18(a) claims must be dismissed for the additional reasons that they are untimely and they fail adequately to plead actual reliance.

       **A.   Plaintiffs' Section 18(a) Claims Are Untimely.**

A Section 18(a) claim must be "brought within one year after the discovery of the facts constituting the cause of action". 15 U.S.C. § 78r(c). The Seventh Circuit has not yet determined when the Section 18(a) limitations period begins to run—either on "inquiry notice", *Beezley v. Fenix Parts, Inc.*, 2018 WL 3156805, at *3-4 (N.D. Ill. June 26, 2018), or when a "reasonably diligent plaintiff would have known" of their cause of action, *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010). But it does not matter which standard applies because by May 2, 2018, more than one year before either complaint was filed, (1) three of the alleged corrective disclosures had occurred (*Twin* ¶¶ 208, 211, 215; *Manikay* ¶¶ 206, 209, 213), (2) Fresenius had publicly accused Akorn of fraud stemming from FDA non-compliance in a detailed counterclaim, (3) Akorn's share price had declined by more than 50%, and (4) the related class action complaint had been filed, establishing that a diligent plaintiff *did* know of its

33

cause of action.[63]  This is a sufficient "constellation of facts" to satisfy either standard.[64]

Plaintiffs' Section 18(a) claims are untimely because both Complaints were filed more than one year after May 2, 2018, and the alleged misstatements or omissions occurred before that date (with one immaterial exception).  By waiting over a year after being placed on notice of their claims, Plaintiffs' allegations concerning statements made on or before May 2, 2018 are time barred.[65]  As a result, Plaintiffs have "pleaded [themselves] out of court".  *Levenfeld v. Boyd*, 2003 WL 22532801, at *6 (N.D. Ill. Nov. 6, 2003); *Montanez v. Wolfenberger*, 2013 WL 12120058, at *2 (N.D. Ill. Oct. 1, 2013) ("'Where it is evident from the face of the complaint ... a court can decide as a matter of law whether plaintiff discovered or should have discovered the cause of action outside the limitations period.'" (citation omitted)).

### B.       Plaintiffs Fail Adequately To Plead Actual Reliance.

Section 18(a) requires that Plaintiffs allege "actual reliance"—*i.e.*, that they actually read and relied on the filed document.  *In re Bear Stearns Cos. Sec., Deriv. & ERISA Litig.*, 995 F. Supp. 2d 291, 308-09 (S.D.N.Y. 2014).  The mere allegation that Plaintiffs read and relied on the misstatements at some time prior to purchasing securities is not sufficient to plead actual reliance.  Plaintiffs must also identify both (i) "particular transaction[s]" made in reliance on the alleged misstatements, which is not satisfied by general references to all purchases, *Bear Stearns*,

---

[63] *See* Class Action Complaint, *In re Akorn, Inc. Data Integrity Sec. Litig.*, No. 18-cv-01713, ECF No. 1 (N.D. Ill. March 8, 2018).

[64] *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 300-01 (S.D.N.Y. 2014); *see also 421-A Tenants Assoc. Inc. v. 125 Court Street LLC*, 2017 WL 6612933, at *5 (E.D.N.Y. Nov. 2, 2017) (lower inquiry notice standard was satisfied because "the filing of a substantially similar action against the same defendants is evidence that a 'reasonably diligent plaintiff would have discovered the facts constituting the violation'").

[65] Plaintiffs' Section 18(a) claim was not tolled by the filing of the related class action litigation before this Court because the class action complaint did not allege a Section 18(a) claim.  *See In re Copper Antitrust Litig.*, 436 F.3d 782, 794 (7th Cir. 2006); *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 467 (1975).

995 F. Supp. 2d at 309; *Special Situations Fund III QP*, 33 F. Supp. 3d at 444; and (ii) a "causal nexus between th[ose transactions] ... and [the challenged] statements" demonstrating that those statements caused Plaintiffs to make each purchase, *Witriol v. Conexant Sys., Inc.*, 2006 WL 3511155, at \*7 (D.N.J. Dec. 4, 2006); *Bear Stearns*, 995 F. Supp. 2d at 309.[66]

> "[Plaintiff] alleges that it 'read' and 'relied' on the alleged misrepresentations in the 2006 10-K 'in deciding whether it should purchase [Defendant] securities,' which it admits occurred over a year-long period from March 2007 through March 2008. [Plaintiff] does not link its review of any particular statement in that document or any other document to any actual purchases of [Defendant] securities and does not identify a particular transaction it allegedly made in reliance on the document or any other document. [Plaintiff's] generic response that 'every ... [purchase] was in reliance on the specific misrepresentations and omissions identified in the Complaint,' is not sufficiently particularized." *Bear Stearns*, 995 F. Supp. 2d at 309 (internal citations omitted).

Plaintiffs do not satisfy this requirement. They make the generic allegation that "each purchase and acquisition" was motived by the alleged misstatements. (*Twin* ¶ 204; *Manikay* ¶ 202.) But that is too "general" and "insufficiently particularized" to satisfy the applicable pleading requirements. *Bear Stearns*, 995 F. Supp. 2d at 309; *Special Situations Fund III QP*, 33 F. Supp. 3d at 444. As a result, Plaintiffs' Section 18(a) claims must be dismissed.

## IV.    PLAINTIFFS DO NOT STATE A SECTION 20(a) CLAIM.

Because there is no primary violation of any securities laws, there can be no "control person" liability under Section 20(a). *Pugh*, 521 F.3d at 693; *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 719-20 (N.D. Ill. 2005).

## CONCLUSION

For the foregoing reasons, the Complaints should be dismissed in their entirety, with prejudice, for failure to state a claim.

---

[66] *See also Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) ("[Plaintiffs] are better positioned than anyone else to know what their actual reliance was.").

Respectfully submitted,

AKORN, INC., RAJAT RAI, DUANE A. PORTWOOD,
ALAN WEINSTEIN, RONALD M. JOHNSON, and
BRIAN TAMBI,

By their attorneys,

/s/ Robert H. Baron
Robert H. Baron (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
    825 Eighth Avenue
        New York, NY 10019
            rbaron@cravath.com

James R. Figliulo
FIGLIULO & SILVERMAN, P.C.
    10 S. LaSalle Street, Suite 3600
        Chicago, IL 60603
            jfigliulo@fslegal.com

Date:  September 13, 2019

<u>**Certificate of Service**</u>

The undersigned attorney hereby certifies that he caused a copy of the attached

**Defendants' Memorandum of Law In Support of Their Joint Motions to Dismiss the *Twin***

***Master Fund* and *Manikay Master Fund* Complaints Pursuant to Fed. R. Civ. P. 12(b)(6)**

**& 9(b) and 15 U.S.C. § 78u-4** to be electronically filed with the Clerk of the Court on

September 13, 2019.  Notice of this filing will be served upon counsel of record via Electronic

Notification by the District Court's ECF Filing System.


/s/ Robert H. Baron
_____
Robert H. Baron (admitted *pro hac vice*)